1
2
3
4
5
6
7
8               **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ENDURANCE AMERICAN SPECIALTY                    CASE NO. CV F 10-1284 LJO BAM
     COMPANY,
12                                                    **SUMMARY JUDGMENT DECISION**
                              Plaintiff,              (Docs. 60, 62, 63, 69.)
13          vs.

14   LANCE-KASHIAN & COMPANY, et al.,

15                          Defendants.
     _____/
16

17   AND RELATED COUNTER-ACTION

18   _____/

19                              **INTRODUCTION**

20          This insurance coverage action addresses allocation of costs, setting hourly rates, and selection

21   of counsel to defend insureds and non-insureds in an underlying action.  Plaintiff/counter-defendant

22   Endurance American Specialty Insurance Company ("Endurance") seeks summary judgment to the effect

23   that it reasonably set and allocated defense costs for counsel selected by Endurance insureds

24   defendants/counter-complainants Edward Kashian ("Mr. Kashian"), Jennifer Schuh ("Ms. Schuh"), and

25   Lance-Kashian & Company ("Lance-Kashian").[1]  The insureds seeks summary judgment to the effect

26   that Endurance's reservation of rights entitled the insureds to select independent counsel to defend the

27   _____

28          [1]        Mr. Kashian, Ms. Schuh and Lance-Kashian will be referred to collectively as the "insureds."

                                          1

1   insureds in the underlying action and in turn to pay defense costs reasonably related to the insureds'

2   defense and in amounts greater than what Endurance claims is reasonable.  This Court considered the

3   parties' cross-summary judgment motions on the record without a hearing, pursuant to Local Rule

4   230(g).[2]  For the reasons discussed below, this Court GRANTS summary judgment to the effect that

5   Endurance reasonably set and allocated defense costs for counsel to which it consented.

6   **BACKGROUND**

7   **The Insureds And Others**

8       Lance-Kashian is a California corporation with real estate interests in California.  Mr. Kashian

9   is the sole shareholder and chief executive officer of Lance-Kashian and is its former president.  Ms.

10  Schuh is Mr. Kashian's daughter and former chief executive officer of Lance-Kashian.

11      Lance-Kashian is the general partner of River Park Properties III ("RPP III"), a non-party to this

12  action.  RPP III is the general partner of non-party Park 41 Limited Partnership ("Park 41") and owns

13  64 percent of Park 41.  In his declaration, Mr. Kashian states that Lance-Kashian controls RPP III

14  pursuant to RPP III's partnership agreement.

15      At relevant times, non-party Gottschalks, Inc. ("Gottschalks") was the sole limited partner of

16  Park 41 and owned 36 percent of Park 41.

17      At relevant times, Libby Franson was the risk manager for Mr. Kashian's companies, including

18  Lance-Kashian and RPP III, oversaw insurance issues for the companies, and communicated with

19  insurers, including Endurance.

20  **Prior Endurance Policy**

21      Endurance issued to the insureds and RPP III a Professional, Management, Employment

22  Practices and Fiduciary Liability Insurance Policy ("prior policy"), effective during 2008.  In her

23  deposition, Ms. Franson testified that upon renewal of the prior policy in fall 2008, Mr. Kashian

24  

---

25      [2]      This Court carefully reviewed and considered the record, including all evidence, arguments, points and
    authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed
26  by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the
    effect that this Court did not consider the evidence, argument, document, objection or paper. This Court thoroughly reviewed,
27  considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does
    not rule on evidentiary matters in a summary judgment context, unless otherwise noted.

28  

2

1  instructed Ms. Franson not to maintain RPP III and other entities as insureds on the renewed policy: "Mr.

2  Kashian made a decision not to.  He felt it was most important to have the general partner as an insured."

3  Ms. Franson noted a premium savings.  Mr. Kashian testified that only he was authorized to omit RPP

4  III from a renewed policy.

5  **The Effective Endurance Policy**

6  In late 2008, Endurance issued to the insureds a Professional, Management, Employment

7  Practices and Fiduciary Liability Insurance Policy ("policy"), effective during 2009.  Endurance notes

8  that the policy "eliminated RPP III as an insured" and "expressly" provided coverage for Lance-Kashian,

9  its subsidiaries, joint ventures and their directors, officers and employees.  Endurance points out that

10  RPP III is neither a subsidiary nor joint venture of a named insured under the policy.

11  The policy gives Endurance "the right and duty to defend any **Claim** against an **Insured**"[3] and

12  provides that Claim Expenses incurred in the defense of a Claim are included in the policy's $2 million

13  limits.  The policy defines **"Claim Expenses"** as:

> 1.  reasonable fees charged by any lawyer selected by mutual agreement between the
> **Company** and the **Insured**.  However, if after a good faith attempt by the **Company**, the
> **Company** and the **Insured** cannot agree on the selection of the lawyer, the **Company**
> shall select the lawyer.

> 2.  all other reasonable fees, costs and expenses resulting from the investigation and
> defense of a **Claim**, if incurred by the **Company** or by the **Insured** with the written
> consent of the **Company**.

19  Pursuant to the policy, Endurance's determination "as to the reasonableness of **Claim Expenses**

20  shall be conclusive on the **Insured**," and "the **Insured** shall not, except at the **Insured's** own cost, make

21  any payment . . . or assume any obligation . . ."

22  The policy includes an "Allocation" provision ("allocation provision"), which provides:

> If a **Claim** made against any **Insured** includes both covered and uncovered
> matters or is made against both an **Insured** and others not insured under this Policy, the
> **Insured** and the **Company** agree that there must be an allocation between insured and
> uninsured **Loss**. The **Insureds** and the **Company** shall use their best efforts to agree
> upon a fair and proper allocation between insured and uninsured Loss.  However, *the
> **Company** shall not seek to allocate with respect to **Claim Expenses** and shall pay one
> hundred percent (100%) of **Claim Expenses** so long as a covered matter remains within
> the **Claim**.*  (Italics added.)

---

[3]  Unless otherwise noted, bold text appears in the original policy text.

3

**Fireman's Fund Policy**

The insureds purchased from Fireman's Fund Insurance Company ("Fireman's Fund") a portfolio policy ("Fireman's Fund policy"), which was effective during late 2009 and which covered RPP III.

**The Underlying Action**

On November 12, 2009 when the policy was in effect, Gottschalks, as debtor in a Delaware bankruptcy proceeding, filed an adversary proceeding ("underlying action") against the insureds and RPP III to allege that the insureds and RPP III had wrongfully interfered with Gottschalks efforts to assign its limited partnership and leasehold interests in Park 41, which owned the Gottschalks corporate headquarters building in Fresno.  Gottschalks' Adversary Complaint ("Gottschalks complaint") in the underlying action sought declaratory and injunctive relief, compensatory and punitive damages, and attorney fees and alleged claims for lease interference, breaches of lease agreement, covenant of good faith and fair dealing and fiduciary duty, and intentional and negligent interference with prospective economic advantage.[4]

More specifically, the Gottschalks' complaint accused the insureds and RPP III of:

> . . . scheming to misappropriate the value of the Debtor's [Gottschalks'] interest in the partnership for less than its fair market value or improperly squeeze down the size of the Debtor's interest for their own benefit.  In furtherance of their scheme, Defendants have made material misrepresentations to potential buyers of the Debtor's assets to dissuade them from purchasing the partnership interest and have made or threatened to make financial and other demands on the Debtor under the partnership agreement and the headquarters' lease that are unreasonable and unjustified and designed to coerce the Debtor into forfeiting its partnership interest or dissuading potential assignees from acquiring such interest.

The Gottschalks complaint further accused the insureds and RPP III of engaging in acts "to harass the Debtor and disrupt its bankruptcy case." In seeking punitive damages, the Gottschalks complaint alleged that the insureds and RPP III "acted oppressively, fraudulently, and maliciously in intentionally interfering with the Office Lease and Debtor's efforts to assign [its partnership and leasehold interests] and in breaching or causing the breach of RPP III's fiduciary duties to the Debtor."

The Gottschalks complaint's intentional interference with prospective economic advantage claim alleged that the insureds and RPP III "engaged in wrongful conduct by making intentional

---

[4] The Gottschalks complaint alleged seven claims against the insureds and RPP III jointly and six claims against RPP III alone.

4

misrepresentations" to a potential buyer of Gottschalks' partnership and leasehold interests which "were designed to interfere with or disrupt" Gottschalks' offer to assign those interests.  The claim further alleges that the insureds and RPP III "engaged in wrongful conduct by deliberately mismanaging the Office Building and failing to act in good faith with respect to" one of its tenants and that such conduct was "designed to interfere with or disrupt negotiations" between Gottschalks and a tenant over assignment of Gottschalks' interests.

The Gottschalks' complaint alternatively alleged that the insureds and RPP III's interference with prospective economic advantage was "negligent." The Gottschalks complaint's intentional and negligent interference with prospective economic advantage claims sought damages "not less than $2.0 million" regarding attempts to assign it interests and "not less than $92,000 per month" in carrying costs for the office lease.

The insureds characterize the Gottschalks complaint to allege that the insureds and RPP III made unjustified capital calls on Gottschalks and withheld limited partnership distributions to Gottschalks to "unjustly enrich[]" the insureds and RPP III at Gottschalks' expense.  The Gottschalks' complaint's intentional interference with office lease claim alleged that the insureds and RPP III "caused Park 41 to breach the Office Lease and the implied covenant of good faith and fair dealing by having Park 41 improperly account for the replacement of the roof membrane on the Office Building as an operating cost . . . and by illegitimately charging the Debtor the full pro-rata amount of the replacement of the roof membrane replacement."  The Gottschalks' complaint further accused the insureds and RPP III of "deliberate mismanagement of the Office Building and failure to act in good faith with respect to and in breach of the Office Lease."

The Gottschalks' complaint alleged that the insureds and RPP III engaged in conduct with purposes of:

> (i) coercing the Debtor into default under the Office Lease, thus triggering the Penalty Clause that reduces the Debtors LP Interest to 1%, (ii) driving away all potential assignees and forcing the Debtor to sell its assets for less than fair market rate, or (iii) otherwise improperly obtaining the value of Debtor's property for themselves.

**Tender Of Defense**

Prior to the underlying action's filing, the insureds and RPP III had retained Cozen O'Connor,

5

1    a large international law firm, Walter & Wilhelm Law Group ("Walter Wilhelm"), and Allen Matkins

2    Leck Gambel Mallory & Natsis ("Allen Matkins") to represent their collective interests in the

3    Gottschalks' bankruptcy.  On November 17, 2009, the insureds informed Endurance of the underlying

4    action and requested Endurance's permission to use Cozen O'Connor to defend the insureds and RPP

5    III in the underlying action.

6        The insureds and RPP III also tendered the underlying action to Fireman's Fund for coverage

7    under the Fireman's Fund policy.

8                        **Endurance's Reservation Of Rights Letter**

9        Endurance responded with its December 30, 2009 reservation of rights letter ("ROR letter")[5] by

10   which Endurance noted that it "accepted coverage for the Underlying Lawsuit subject to its reservation

11   of rights" and responded that Endurance "was entitled to select defense counsel for the Insureds."  The

12   ROR letter observed that Cozen O'Connor's rates "are substantially higher than Endurance's generally

13   accepted rates for counsel" and that Cozen O'Connor represented RPP III for which there was no

14   coverage under the policy.  The ROR letter continued:

15           Accordingly, Endurance will only consent to the Insureds' proposed defense arrangement
             and retention of Cozen O'Connor at reduced hourly rates as follows: (1) maximum
16           hourly rates for partners of $350/hr; (2) maximum hourly rates for associates of $250/hr;
             and (3) maximum hourly rates for paralegals of $150/hr.

17
                     . . . RPP III is not an Insured under the policy and therefore no coverage is
18           afforded under the Policy for the defense of RPP III.  Endurance understands that Cozen
             O'Connor may also be defending RPP III in connection with the Adversary Proceeding.
19           Thus, to the extent Endurance agrees to Cozen O'Connor's defense of the Insureds in
             connection with the Adversary Proceeding, an allocation between Cozen O'Connor's
20           defense of the Insured parties and its defense of the non-insured RPP III will be
             necessary.  Based on the allegations and legal theories set forth in the Adversary
21           Proceeding, it appears that RPP III is the subject to the majority, if not all, of any
             potential liability arising out of the Adversary Proceeding.  Thus, Endurance proposes
22           an allocation of one-third of the defense costs incurred by Cozen O'Connor in defending
             the Adversary Proceeding to the Insured parties and two-thirds to the non-insured party
23           RPP III.

24       Endurance characterizes the ROR letter to communicate that it was willing to forego its

25   contractual right to select defense counsel and would consent to the insureds' choice of counsel if

26   Endurance:

27   ───────────────────

28       [5]        On December 14, 2009, prior to the ROR letter, the insureds filed their answer in the underlying action.

1.      Reimbursed defense costs at hourly rates of $350 for partners, $250 for associates, and

$150 for paralegals; and

2.      Paid only one-third of the attorneys fees of insureds' choice of counsel because such

counsel represented uninsured RPP III.

The ROR letter identified "actual and potential coverage defenses that are now known to

Endurance" and stated:

> . . . Section III.A.1. of the Management Liability Coverage Part of the Policy provides that Endurance shall not be liable to make any payment for Loss in connection with any Claim made against any Insured brought about or contributed to in fact by the *intentionally dishonest, fraudulent* or criminal act of any Insured as determined by a final adjudication in the underlying action.  To the extent such conduct is determined by any final adjudication in the Adversary Proceeding, no coverage would be afforded for the Adversary Proceeding under the Policy.  In addition, certain *intentional Wrongful Acts* allegedly committed by the Insureds may be uninsurable under California law pursuant to Cal. Ins. Code § 533, which precludes coverage for willful acts.  See California Amplifier, Inc. v. RLI Ins. Co., 94 Cal. App. 4th 102 (2001).  (Italics added.)

> . . .Section III.A.2. of the Management Liability Coverage Part of the Policy provides that Endurance shall not be liable to make any payment for Loss in connection with any claim made against any Insured brought about or contributed to in fact by any profit, remuneration or financial advantage  gained by any Insured to which such Insured is not legally entitled as determined by a final adjudication in the underlying action.

> . . .

> . . . Section III.P. of the Management Liability Coverage Part of the Policy provides that Endurance shall not be liable to make any payment for Loss in connection with the Insured's rendering, or actual or alleged failure to render, services for others. To the extent that the Debtor seeks damages or loss arising from the Insureds rendering, or actual alleged failure to render, services for others, no coverage is afforded under the Policy for the Adversary Proceeding.

The insureds note that the ROR letter failed to mention California Civil Code section 2860

("section 2860") which addresses "Conflict of Interest Between Insured and Insurer – Appointment of

Independent Counsel" and failed to address otherwise the issue of independent counsel.  The ROR letter

stated:

> Endurance understands that the Insureds wish to retain Cozen O'Connor to defend their interests in connection with the Adversary Proceeding because that firm has been representing the Insureds and RPP III in connection with the Debtor's bankruptcy proceedings prior to the filing of the Adversary Proceeding. . . . Endurance will only consent to the Insureds' proposed defense arrangement and retention of Cozen O'Connor at reduced hourly rates . . .

In a footnote, the ROR letter addressed Endurance's "right to select" counsel:

If Cozen O'Connor is unwilling to defend the Adversary Proceeding at Endurance's proposed hourly rates, the Insureds may pay the difference between Endurance's proposed hourly rates and the actual rates charged by Cozen O'Connor. Alternatively, Endurance will propose a different firm to defend the Insureds in connection with the Adversary Proceeding.  As provided by Section II.C.1. of the General Terms and Conditions of the Policy, if Endurance and the Insureds cannot agree on the selection of counsel, Endurance shall have the right to select counsel of its choosing.

**Subsequent Communications**

***January 5, 2010 Conference Call***

Endurance notes that from the time of the December 30, 2009 ROR letter to February 2010, Endurance "sought confirmation" that the insureds intended to retain counsel of their choice subject to the ROR letter conditions and reminded the insureds that "Endurance was prepared to select different defense counsel if those conditions were not acceptable to the Insureds."

On January 5, 2010, Ms. Franson and Lance-Kashian's broker David Stewart participated in a conference call with Endurance's Jon Minett ("Mr. Minett") and Endurance's outside counsel Keith Little ("Mr. Little") to discuss the ROR letter. Ms. Franson testified that "we went through basically this reservation of rights letter," that Mr. Little "reiterated the stuff in this letter," and that she left the conference call thinking "there might be some room to work with the defense." Mr. Little declares: "At no time during that call did anyone object to Endurance's position set forth in the December 30, 2009 letter or otherwise raise any concerns with that letter."

As to the conference call, Ms. Franson declares:

> . . . I did not feel that it was appropriate much less incumbent upon me to express during that teleconference any objections to Endurance's position relative to the defense of the Insureds in the Adversary Proceeding. . . . I did not understand the December 30, 2009 reservation of rights letter to be an "offer."  Rather, the letter stated Endurance's position with respect to its extension of a defense under reservation of rights and made what I understood to be the opening of negotiations with respect to allocation between the cost of defense of the Insureds . . . .

***Endurance's Inquiries As To Defense Arrangements***

During January 11, 2010 to February 10, 2010, Mr. Little sent to Ms. Franson emails which Endurance characterizes as requests for the insureds to confirm that they desired their choice of counsel for the underlying action and as reiterations that "such defense" was subject to the ROR letter's conditions.

8

Mr. Little's January 11, 2010 email stated:

> Following up on our call last Monday, please let us know if there has been any further discussions regarding defense arrangements for this matter. We would like to make sure we are all on the same page regarding defense arrangements before this matter gets to [sic] far along.

Ms. Franson's January 11, 2010 email to Mr. Little stated:

> There is another law firm involved in this case and that is Allen Matkins. My understanding is that they were the law firm that worked on the partnership agreement and the office lease for RPPIII (formerly RPPI) with Gottschalks and will probably be used as an expert witness versus defense counsel.

Mr. Little's subsequent January 11, 2010 email stated:

> . . . Endurance is prepared to line up Delaware counsel for this matter if Cozen O'Connor is unable to lower its rates or Lance Kashian does not want to pay the difference between Cozen O'Connor's actual rates and the rates Endurance will pay.
>
> . . .
>
> Please let us know as soon as you have any communications regarding Cozen's rates. If a change in counsel is going to be needed, Endurance would like to make that change before the end of the week if possible.

Mr. Little's January 14, 2010 email stated: "Please let us know if there have been any developments regarding the defense arrangement for this matter." Ms. Franson's January 14, 2010 email responded:

> Here is the information on the Allen Matkins attorneys. They are acting as counsel and expert witnesses, evidently. . . . Mr. Kashian seems hesitant to approach Cozen O'Connor regarding their rates, but he definitely wants to use them. . . .

Mr. Little's January 15, 2010 email responded:

> Thank you for the information on Allen Matkins.
>
> . . . if Cozen O'Connor refuses to defend this matter at lower rates but Mr. Kashian insists on using them, as discussed in our December 30th letter, Lance Kashian can pay the difference between Endurance's proposed hourly rates and the actual rates charged by Cozen O'Connor. Otherwise, Endurance is prepared to select different counsel to defend this matter at rates close to those proposed in our December 30th letter. Please keep us posted on the direction Mr. Kashian and Lance Kashian want to go with this as we would like to have mutually agreeable defense arrangements in place as soon as possible.

On January 19, 2010, Ms. Franson sent Mr. Little her email exchange with Mr. Kashian of the same day. Ms. Franson wrote Mr. Kashian:

9

Endurance needs to know today what we have decided regarding our Delaware representation. If we stay with Cozen O'Connor, we will be responsible for the difference in rates. My understanding is that we do want to stay with Cozen O'Connor, but I just wanted to confirm with you.

Mr. Kashian responded: "Libby I do not know – I have my hands full and I'm rtrying [sic] to settle this case – tell them to stay cool."

In forwarding these emails to Mr. Little, Ms. Franson wrote: "This is where I am with Mr. Kashian. Mike Wilhelm might be able to shed some light on what is going on with proceeding. Please feel free to contact him. Sorry I cannot be of more assistance at this time."

Mr. Kashian testified as to his "stay cool" comment:

Q.    What did you mean by "tell them to stay cool"?

A.    I don't know. I'm in the middle of a recession and four bankruptcies and I'm trying to get this thing settled and those guys are asking me, "Well, will you make an agreement, we'll pay for lawyers fees?" To me that's really, really out of line. You know, I've got my hands full.

Q.    You have your hands full with the bankruptcies, the lawsuit –

A.    This lawsuit, bankruptcies, the economy, and the rest of it, yes.

Q.    And did you – was the insurance a distraction?

A.    Yes. . . .

Mr. Little's January 19, 2010 email stated:

At this point, it appears that the Insureds would like to keep Cozen O'Connor as Delaware local counsel. As set forth in our prior correspondence, Endurance will reimburse covered defense costs at rates set forth in our December 30th letter (i.e., maximum of $350/hr for partners, $250/hr for associates, and $150/hr for paralegals), subject to the self-insured retention and the reservation of rights set forth in our December 30th letter.

### The Insureds' Defense Billings

Ms. Franson's February 8, 2010 email to Mr. Little inquired into Endurance's approval of Walter Wilhelm's defense of the insureds:

Mike Wilhelm asked me if Endurance has approved him as one of the counsel we have retained to handle the Gottschalks matter and I really wasn't sure. Has he been approved? I had sent you his billing to date a few weeks ago. Please advice. [sic]

Mr. Little's February 8, 2010 email responded:

10

Mike [Mr. Wilhelm] is approved to serve as counsel for the Gottschalks matter at the rates you previously sent us (I believe $350/hr).[6]  In fact, based on the information we have received regarding the adversary proceeding, Endurance prefers that Mike primarily handle most of the litigation tasks to the extent possible.  One of Endurance's general concerns with having multiple counsel is that they do not duplicate efforts.  Our understanding is that Mike has been handling the depositions thus far and Endurance believes that this is an appropriate arrangement, provided that Cozen O'Connor is not also participating in the depositions.  In general, please provide us with copies of the defense cost invoices that have been incurred in connection with the adversary proceeding as soon as they are available so that we can monitor the staffing of this matter and further discuss with you and/or Mike if Endurance has any questions regarding how the case is being staffed.

Ms. Franson's February 9, 2010 email inquired into billing procedures: "What is the procedure for submitting the attorney's invoices to Endurance for reimbursement of the portion of legal fees Endurance has agreed to?"  Mr. Little's February 10, 2010 email responded:

Please send the attorneys' invoices to us and they will be reviewed for reimbursement. Once the Policy's $100,000 retention is exhausted by covered defense costs (e.g., defense costs subject to the rates Endurance has agreed to reimburse and the allocation between covered and uncovered parties), Endurance will begin reimbursing covered defense costs on an as submitted basis, subject to Endurance's reservation of rights.  At this point, please send us all invoices that Lance-Kashian believes should be applied towards the retention and/or otherwise reimbursed.

Ms. Franson testified:

> Q.   . . . and at the time he [Mr. Little] responded to you on February 10th, 2010 there's still no response from the insureds concerning the defense arrangements, correct?
>
> . . .
>
> Ms. Franson: There was no response – I can't recall, I believe we may have had some conversations about what we're going to do there.
>
> . . .
>
> Q.   But nothing was communicated at this time to Endurance?
>
> A.   Correct.
>
> . . .
>
> Q.   Now, when Mr. Little advised you of the process for submitting invoices you responded by saying, "Thank you, Keith," correct?
>
> A.   Correct.

---

[6]   Endurance acknowledges that it agreed to Mr. Wilhelm's retention at $350 an hour.

11

Q.   You did not say "Thank you, Keith.  But we don't agree with Endurance's position," correct?

A.   I did not say that.

Q.   Okay.  You didn't say "Thank you, Keith.  We still are trying to come to a resolution of the defense cost.  We'll get back to you shortly"?

A.   I did not say that.

Q.   Okay.  You did not say Thank you, Keith.  But we're reserving all of our rights to contest your position"?

A.   I did not write that here, no.

During March 9, 2010 to April 13, 2010, Ms. Franson sent Mr. Little six emails to submit no less than 15 invoices to Endurance for processing.  Ms. Franson acknowledged that the emails included no "caveats" that the insureds expected Endurance to pay all defense fees.  Mr. Little's March 30, 2010 email to Ms. Franson raised concerns over Allen Matkins' role:

> I was under the impression that Allen Matkins was serving as expert witness versus counsel.  However, the Allen Matkins invoices received to date appear to be along the line of defense representation.  Please provide a brief explanation regarding the different roles that Allen Matkins is involved in the litigation and how their efforts relate to Mike Wilhelm's defense of the Insureds.  Endurance is concerned that Allen Matkins' invoices appear to be work beyond what we originally anticipated with respect to that firm's role in the litigation.

Endurance notes that on its review of the invoices, it "realized" that Cozen O'Connor, Walter Wilhelm and Allen Matkins defended the insureds in the underlying action although the ROR letter did not consent to Allen Matkins' as defense counsel.  Mr. Little's April 1, 2010 email to Ms. Franson expressed "concerns . . . regarding defense costs":

> First, Endurance did not consent to Allen Matkins serving as counsel for this matter as it was our understanding that Allen Matkins would only be retained as an expert witness and not as defense counsel.  To be sure, Endurance was reluctant to agree to two separate firms defending this matter (i.e., Walter & Wilhelm Law Group and Cozen O'Connor) for fear that defense costs could become duplicative and excessive.  It appears that those concerns were justified given the total defense costs that have apparently been incurred to date by Walter Wilhelm, Cozen O'Conor, and now the Allen Matkins firm.  I will call Mike Wilhelm for further clarification on the roles that each firm is playing with respect to defending this matter.  However, at this point, the cumulative invoices are troubling to say the least.  In the meantime, Endurance will begin reviewing the invoices to determine if the amount of reasonable, covered defense costs exceed the Policy's $100,00 retention after applying the agreed rate cap and 1/3 allocation to the invoices (as well as any other necessary deductions).

Second, your March 31st email is the first time that we heard about a mediation that

12

1
2
3
4
5
6

> apparently took place on March 30.  Please recall that, pursuant to Section IX.C. of the Policy, the Insureds shall keep Endurance apprised of any material developments like a mediation.  In addition, the Insureds shall not, except at the Insured's own cost, make any payment, admit any liability, settle any claims, or assume any obligation unless such settlement together with defense costs does not exceed the Policy's retention.  To the extent that the Insureds contemplate seeking any reimbursement or contribution from Endurance towards any settlement, the Insureds must seek and obtain Endurance's consent prior to entering into such settlement.  Given that Endurance was not advised of the mediation, Endurance must assume that the Insureds are currently contemplating a settlement at their own costs, if any.

7
8

The insureds characterize Mr. Little's April 1, 2010 email as Endurance's "first express objection to the retention of Allen Matkins as co-defense counsel."

9
10
11
12

During March 9, 2010 to February 22, 2011, Ms. Franson transmitted to Mr. Little invoices for third-party vendors LEG, LLC, Isdaner & Company, and Kolodny & Pressman.  Endurance notes that the insureds had not sought Endurance's consent to retain such experts and that Endurance never consented to their retention.

13
14
15
16

Ms. Franson's April 12, 2010 email submitted invoices and stated: "My understanding is that Endurance has proposed an allocation of one-third of the defense costs to LK & Co. and two-thirds to RPPIII.  **I also understand that LK&Co/RPPIII will be responsible for the hourly rates for the attorneys over and above the Endurance approved rates.**"  (Bold added.)  Ms. Franson declares:

17
18
19

> By stating, "I also under that LK&Co/RPPIII will be responsible for the hourly rates for the attorneys over and above the Endurance approved rates," I was not indicating that the Insureds had agreed to any proposal, as Mr. Kashian had not so agreed, and I had no authority to make such an agreement.  Rather, I was reciting what I understood Endurance's position was.

20
21

Endurance notes that after nearly $1 million of defense billings, Ms. Franson's April 13, 2010 email to Mr. Little suggested that Endurance should pay all defense costs:

22
23
24
25
26

> I need to talk to you about what the insurance company is going to do regarding the costs and fees being incurred because this is going to become a key issue in getting this matter resolved.  The defendants [insureds and RPP III] want to be able to charge the attorney fees that they have to pay back to the Park 41 partnership.  That however means that Gottschalks are [sic] bearing 36% of those costs as the limited partner.  **The insurance company should be covering these costs and attorney fees.**  To the extent that they are being covered this sticking becomes a non-issue.  I think that the rest of the issues can be worked through but the attorneys' fees issues could become a real obstacle.  (Bold added.)

27
28

Endurance claims that on April 23, 2010, the insureds first explained their position that Endurance

13

1    should pay all defense costs incurred by the insureds and RPP III.

2          Mr. Little's June 4, 2010 email to the insureds' defense counsel noted a rescheduled trial to

3    August 2, 2010 to permit continuing settlement negotiations:

> Given that the parties are reportedly close to settlement and Cozen O'Connor likely
> completed most of its trial preparation leading up to the previously scheduled May 21
> trial date, Endurance believes that the amount of trial preparation and other work
> incurred by your firms between now and August 2 should be kept to a minimum while
> the parties work toward finalizing a settlement.  If you believe that significant work
> needs to be done between now and August 2, please let us know immediately.

8          Mr. Little's July 9, 2010 letter indicated that Endurance will issue a $52,552.69 check which

9    reflects "Endurance's deductions . . . based upon the hourly rate cap and one-third allocation between

10   fees and expenses incurred on behalf of the Insureds and the non-insured River Park Properties III, LLP"

11   and "deductions for fees and expenses incurred by firms and/or experts that Endurance did not consent

12   to or appoint." Mr. Little's October 20, 2010 letter noted Endurance's $16,014.77 check which reflected

13   Endurance's deductions for defense allocation and non-consented to defense costs.

## Settlement Of Underlying Action

15         Endurance points out that from the underlying action's outset, the insureds engaged in settlement

16   negotiations with Gottschalks.  A January 2011 settlement of the underlying action was reached by

17   which the insureds, RPP III and/or their affiliates received a $1 million lease rejection payment.  Neither

18   the insureds nor RPP III made a payment in connection with the settlement.

## Defense Costs Disagreement

20         The parties disagree as to the terms of payment of defense costs and their allocation among the

21   insureds and RPP III.  Ms. Franson declares:

> Defendants incurred at least $1,557,295.95 in fees and costs in connection with
> the defense of the Adversary Proceeding. Of the $1,557,295.95 incurred, Lance-Kashian
> & Co. paid $618,251.70 to the law firm of Allen Matkins; $475,000 to the law firm of
> Cozen O'Connor; $124,777.00 to the law firm of Walter & Wilhelm Law Group; and
> $144,133.18 directly to third-party vendors for a total of $1,362,161.88. The foregoing
> payments made by Lance-Kashian & Co. were made pursuant to a joint defense
> arrangement whereby all Defendants to the Adversary Proceeding, including RPP III,
> were defended together due to the interrelationship of their interests. Endurance has paid
> $70,101.34 of the $1,557,295.95 in connection with the defense of the Adversary
> Proceeding.

In his declaration, Mr. Kashian states:

14

The roles of the three law firms retained to defense the Adversary Proceeding were well defined. Cozen & O'Connor is a well established national firm in Delaware with expertise in bankruptcy. It was responsible for appearing in matters before the Court and handling the aspects of the Adversary Proceeding requiring expertise in bankruptcy matters. Allen Matkins had previously handled real estate and partnership issues of Lance-Kashian & Co. Therefore, Allen Matkins was responsible for handling the aspects of the Adversary Proceeding requiring expertise in real estate and California partnership issues. Walter & Wilhelm is familiar with the business of Lance-Kashian & Co. and has represented it in California previously. . . . Partner Michael Wilhelm is familiar with, and knows, the principals of Lance-Kashian & Co. As a result, he served to shepherd Lance Kashian & Co. through the Adversary Proceeding and worked with Lance-Kashian & Co. in regards to all matters needing to be done at its offices. Once Cozen O'Connor and Allen Matkins were in place, Wilhelm's role was significantly limited.

At no time have Defendants accepted any proposal made by Endurance that a certain portion or percentage of the fees/costs in [sic] incurred in defense of the Adversary Proceeding be allocated among defendants in that action. This includes the proposal made in Endurance's December 30, 2009 reservation of rights letter in which Endurance proposed that two-thirds of the fees/costs in [sic] incurred in defense of the Adversary Proceeding be allocated to RPP III. Although we later made a counterproposal to Endurance regarding allocation between Lance-Kashian & Company, Jennifer Schuh and myself on the one hand and RPP III on the other, Endurance did not accept our counterproposal and no agreement has ever been reached.

Ms. Franson testified that she is not "aware of" Endurance selecting counsel for the insureds to defend the underlying action and is not "aware of any misrepresentation" of Endurance regarding issuance of the policy. Ms. Franson further testified that she understood that Endurance did not pay defense experts because "they were not previously approved . . . before the expenses were incurred."

Thomas Gibbs ("Mr. Gibbs"), an Allen Matkins attorney who defended the insureds in the underlying action, and Mr. Wilhelm both declare: "The allegations and issues in the Adversary Proceeding were such that virtually all of the defense fees and costs incurred in defending Defendants could not be separately identified from those incurred in defending RPP III."

**The Parties' Claims**

Endurance's operative complaint ("Endurance complaint") alleges three declaratory relief claims (collectively the "Endurance declaratory relief claims") that:

1.   Endurance is obligated to pay only one-third of the attorney fees charged by Cozen O'Connor and Walter & Wilhelm to defend the underlying action at maximum hourly rates of $350 for partners, $250 for associates, and $150 for paralegals;

2.   The insureds are obligated to pay attorney fees they incurred without Endurance's

1    consent; and

2    3.    The insureds have waived and/or are estopped to seek attorney fees which Endurance did

3          not consent to pay.

4    The complaint alleges a fourth claim that the insureds "breached the covenant of good faith and fair

5    dealing implicit in the contracts described herein by engaging in the aforementioned conduct."  This

6    Court's prior order limited the Endurance complaint's reverse bad faith claim to the extent it is based

7    on contract, not tort, and dismissed attorney fees and punitive damages claims.

8          The insureds proceed on their First Amended Counter-Claim ("insureds' FACC") to allege that

9    Endurance sought to avoid "its key and primary contractual and legal obligations" to provide the

10   insureds a complete defense against the underlying action.  The insureds' FACC alleges that Endurance

11   raised coverage defenses to create an actual conflict of interest under section 2860 to require Endurance

12   to allow the insureds to "control their own defense via their own selection of independent defense

13   counsel to be funded by Endurance."

14         The insureds' FACC alleges:

15   1.    A (first) breach of contract and (second) breach of the covenant of good faith and fair

16         dealing claims that Endurance breached policy provisions to provide the insureds "a

17         complete and independent defense against all claims" and to "pay all reasonable defense

18         costs incurred by the insured[s]";[7]

19   2.    A (third) fraud in the inducement claim that "Endurance engaged in fraud to induce the

20         insured[s] . . . to seemingly acquire the benefits of the insurance coverage purportedly

21         provided under the Policy in exchange for premiums paid";

22   3.    A (fourth) declaratory relief claim that the insureds had "the right to control their own

23         defense" in the underlying action "via independent counsel at the expense of Endurance,"

24         pursuant to section 2860;

25

26        [7]    Endurance notes that "where there is no breach of contract there can be no valid bad faith claim." "Absent
     an underlying contractual right, the implied covenant has nothing upon which to act as a supplement, and should not be
27   endowed with an existence independent of its contractual underpinnings." *Behnke v. State Farm General Ins. Co.*, 196
     Cal.App.4th 1443, 1470, 127 Cal.Rptr.3d 372 (2011) (internal quotations omitted).
28

4.      A (fifth) declaratory relief claim that Endurance is unable to "unilaterally bind" the insureds to Endurance's determinations "as to reasonableness of Claim Expenses" or "avoid it contractual obligation to pay reasonable and necessary defense expenses incurred by the insured[s] . . . to defend against all allegations and claims raised" in the underlying action;

5.      A (sixth) declaratory relief claim that "Endurance remains bound by its obligations under the Policy's 'Allocation' provision whereby Endurance 'shall not seek to allocate with respect to the Claim Expenses and shall pay one hundred percent (100%) of Claim Expenses' in relation to the defense costs and expenditures reasonably and necessarily incurred by the insured[s]"; and

6.      A (seventh) declaratory relief claim that Endurance is not entitled to seek subrogation for amounts paid to the insureds in relation to the underlying action "because Endurance has not fully discharged its debt to its insureds."

In addition to declaratory relief, the insureds' FACC seeks recovery for the insureds' "economic losses," "loss of the insurance coverage and benefits," and "loss of premiums."

## DISCUSSION

### Summary Judgment Standards

Endurance seeks summary judgment on the Endurance declaratory relief claims and contends that such summary judgment further entitles Endurance to summary judgment on the insureds' FACC claims.

The insureds seek summary judgment that:

1.      "Endurance was not entitled to appoint or select its own chosen counsel" and that the insureds "at all times had the right to select and be represented by independent counsel";

2.      Endurance's obligation to defend the insureds "has not been discharged by its payment" of 33 percent of the insureds' defense costs and "Endurance is obligated to pay all defense costs";

3.      "Endurance was not entitled to make any unilateral determination(s) . . . as to what defense costs and expenses ("Claim Expenses") it would pay," including defense

1        counsel's hourly rates"; and

2    4.    Endurance cannot seek subrogation against RPP III and/or Park 41 because Endurance

3          breached its policy obligations and RPP III and/or Park 41 are not independent of the

4          insureds to result in a subrogation claim against the insureds.

5    The insureds contend that such summary judgment in its favor defeats the Endurance complaint's claims

6    and resolves the insureds' FACC claims, except the (third) fraud in inducement claim.

7        F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense

8    – or the part of each claim or defense – on which summary judgment is sought."  "A district court may

9    dispose of a particular claim or defense by summary judgment when one of the parties is entitled to

10   judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st

11   Cir. 1999).

12       Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any

13   material fact and the movant is entitled to judgment as a matter of law."  F.R.Civ.P. 56(a); *Matsushita*

14   *Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv.,*

15   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary

16   judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need

17   for trial."  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers*

18   *v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

19       On summary judgment, a court must decide whether there is a "genuine issue as to any material

20   fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(a), (c); *Covey*

21   *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

22   398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

23   S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

24   1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

25   inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for

26   summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

27   S.Ct. 2505 (1986)

28       The evidence of the party opposing summary judgment is to be believed and all reasonable

inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (2007) (moving party is able to prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case"); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" to entitle the moving party to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

"[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

1   of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

2   make the showing sufficient to establish the existence of an element essential to that party's case, and

3   on which that party will bear the burden of proof at trial.")

4          "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

5   the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

6   106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

7   'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp.*

8   *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

9   289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

10  plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

11         Under F.R.Civ.P. 56(g), a summary judgment/adjudication motion, interlocutory in character,

12  may be rendered on the issue of liability alone.  "In cases that involve . . . multiple causes of action,

13  summary judgment may be proper as to some causes of action but not as to others, or as to some issues

14  but not as to others, or as to some parties, but not as to others."  *Barker v. Norman*, 651 F.2d 1107, 1123

15  (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v.*

16  *Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant

17  summary adjudication as to specific issues if it will narrow the issues for trial."  *First Nat'l Ins. Co. v.*

18  *F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

19         As discussed below, Endurance demonstrates that it is entitled to summary judgment to effect

20  that Endurance reasonably set and allocated defense costs for counsel to which it consented.

21                              **Agreement As To Defense Arrangement**

22         The parties dispute whether they reached agreement in accord with the ROR letter.  Endurance

23  argues that the insureds, by their words and conduct, accepted the ROR letter's terms to serve as the

24  parties' agreement on defense costs.  The insureds argue that the ROR letter was no more than an offer

25  which they did not accept.

26         "A contract is either express or implied."  Cal. Civ. Code, § 1619.  "An express contract is . . .

27  stated in words."  Cal. Civ. Code, § 1620.  "An implied contract is one, the existence and terms of which

28  are manifested by conduct."  Cal. Civ. Code, § 1621.  The "acceptance of the consideration offered with

a proposal, is an acceptance of the proposal." Cal. Civ. Code, § 1584. "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the persons accepting." *Blaustein v. Burton*, 9 Cal.App.3d 161, 181, 88 Cal.Rptr. 319 (1970).

Endurance contends that Endurance and the insureds "had both an express and implied contract concerning the defense arrangements." Endurance relies on the ROR letter to the effect that Endurance agreed to forego its policy right to select defense counsel and consented to the insureds' choice of counsel in exchange for Endurance paying one-third of defense costs at ROR letter reduced rates. Endurance notes that the insureds "were defended by their own counsel" to "evidence that the insureds voluntarily accepted the consideration offered by Endurance and benefitted" to signify the insureds' "acceptance of Endurance's proposal in the ROR letter."

Endurance attributes the insureds to have placed defense arrangements on the "back burner" and to have viewed the issue as a "distraction." Endurance points to Mr. Kashian's email response to Ms. Franson's email inquiry about defense arrangements: "Libby I do not know – I have my hands full and I'm rtrying [sic] to settle this case – tell them to stay cool." Endurance also points to Mr. Kashian's testimony as to his "stay cool" comment:

> Q.   What did you mean by "tell them to stay cool"?
>
> A.   I don't know. I'm in the middle of a recession and four bankruptcies and I'm trying to get this thing settled and those guys are asking me, "Well, will you make an agreement, we'll pay for lawyers fees?" To me that's really, really out of line. You know, I've got my hands full.
>
> Q.   You have your hands full with the bankruptcies, the lawsuit –
>
> A.   This lawsuit, bankruptcies, the economy, and the rest of it, yes.
>
> Q.   And did you – was the insurance a distraction?
>
> A.   Yes. . . .

As further evidence of the insureds' acquiescence to the ROR letter's defense arrangements, Endurance notes that Ms. Franson sent invoices to Mr. Little "without any caveats, objections, or reservations of rights." Endurance resolves that Ms. Franson's April 12, 2010 email "expressly acknowledged the terms of that agreement": "My understanding is the Endurance has proposed an

allocation of one-third of the defense cost to LK & Co. and two-thirds to RPPIII.  I also understand that LK&Co/RPPIII will be responsible for the hourly rates for the attorneys over and above the Endurance approved rates."

Endurance concludes that the insureds accepted the ROR letter's consideration of Endurance's withholding selection of defense counsel in that the insureds:

1.    Continued to have Cozen O'Connor and Walter Wilhelm defend them;

2.    Allowed Cozen O'Connor and Walter Wilhelm to incur substantial defense costs;

3.    Failed to respond substantively to the ROR letter's defense arrangements until after incurring nearly $1 million in defense costs;

4.    Submitted invoices for defense costs consistent with the ROR letter; and

5.    Lulled Endurance to believe there was no issue with defense arrangements.

The insureds contend that "there was no 'meeting of the minds' with respect to Endurance's purported 'offer.'"  The insureds characterize the ROR letter as a "proposal indicating that [Endurance] wished to further negotiate regarding the allocation issue."  The insureds accuse Endurance of using Ms. Franson as an intermediary to "communicate" terms of its "offer" and to confirm that Mr. Kashian agreed to them.  The insureds characterize Ms. Franson as unauthorized to enter into a defense costs agreement.

The insureds fault the absence of evidence that they objectively manifested their consent to the ROR letter's defense arrangements.  "Contract formation is governed by objective manifestations, not subjective intent of any individual involved. The test is what the outward manifestations of consent would lead a reasonable person to believe."  *Roth v. Malson*, 67 Cal.App.4th 552, 557, 79 Cal.Rptr.2d 226 (1998).  The insureds conclude there is no evidence of their acceptance of the ROR letter's defense arrangements.

The insureds continue that their silence cannot be construed as acceptance of the ROR letter's defense arrangements.  "Silence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance."  *Southern California Acoustics Co. v. C. v. Holder, Inc.*, 71 Cal.2d 719, 722. 79 Cal.Rptr. 319 (1969).  The insureds point to the absence of a relationship or previous course of dealing upon

1    which silence could support acceptance of the ROR letter's defense arrangements.

2          The insureds also contend an agreement on defense arrangements fails for "lack of consideration"

3    in that Endurance's invocation of conduct-based coverage defenses created a conflict of interest to

4    preclude Endurance's selection of defense counsel.  The insureds argue that Endurance's foregoing to

5    select defense counsel is not consideration in that Endurance was obligated to provide defense counsel.

6    "A statutory or legal obligation to perform an act may not constitute consideration for a contract."

7    *O'Byrne v. Santa Monica-UCLA Medical Center,* 94 Cal.App.4th 797, 114 Cal.Rptr.2d 575 (2001).

8    "Doing or promising to do what one already is legally bound to do cannot be consideration for a

9    promise."  *Asmus v. Pacific Bell,* 23 Cal.4th 1, 32, 96 Cal.Rptr.2d 179 (2000).

10          As a starting point, this Court is called upon to ascertain what, if anything, Endurance and the

11    insureds agreed upon.  The record is clear that Endurance agreed to retention of Cozen O'Connor and

12    Walter Wilhelm at ROR letter rates.  The insureds agreed to Cozen O'Connor and Walter Wilhelm as

13    defense counsel because they used them but claim that Endurance should pay higher amounts than what

14    Endurance appears willing to pay.  At a minimum, retention of Cozen O'Connor and Walter Wilhelm

15    is not at issue; what Endurance should pay for their retention is.

16          Also at issue is whether Endurance agreed to retention of Allen Matkins as defense counsel.

17    Endurance argues that the policy obligates it to pay only defense costs to which it consents, not defense

18    costs incurred without Endurance's consent.  Endurance points to the policy provision that "the **Insured**

19    shall not, except at the **Insured's** own cost, make any payment . . . or assume any obligation."

20    Endurance notes that the policy obligates it to cover "Claim Expenses," which the policy defines as

21    "reasonable fees charged by any lawyer selected by mutual agreement between" Endurance and the

22    insureds, and "other reasonable fees, costs and expenses resulting from the investigation and defense of

23    a **Claim,** if incurred by the **Company** [Endurance] or by the **Insured**[s] *with written consent of the*

24    **Company***.*"  (Italics added.)

25          "[I]t is only when the insured has requested and been denied a defense by the insurer that the

26    insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's

27    prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's

28    expense."  *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.*, 3 Cal.3d 434, 449,

23

1   91 Cal.Rptr. 6 (1970).

2       Endurance contends that given the insureds' insistence to use "their own lawyers," Endurance

3   consented to defense costs incurred only by Cozen O'Connor and Walter Wilhelm pursuant to the ROR

4   letter's one-third allocation and billing rates.  Endurance concludes that since the insureds did not seek,

5   and Endurance did not consent to, defense costs beyond those of Cozen O'Connor and Walter Wilhelm

6   per ROR letter limitations, additional defense costs, including those of Allen Matkins and third-party

7   vendors, are not "Claim Expenses" for which Endurance is responsible.

8       The insureds point to no meaningful evidence that Endurance consented to retention of Allen

9   Matkins and third-party vendors.  The insureds argue that Endurance created a conflict of interest to

10  entitle them to independent counsel, including Allen Matkins.  Putting aside the conflict of interest issue,

11  this Court focuses immediately on the scope of Endurance consented to defense counsel.  The record is

12  clear that Endurance consented to retention of Cozen O'Connor and Walter Wilhelm only.[8]  The insureds

13  point to no writing whereby Endurance consented to Allen Matkins or the third-party vendors.  Ms.

14  Franson's January 11 and 14, 2010 emails mention Allen Matkins in the capacity of "expert witnesses."

15  The insureds point to no specific request accepted by Endurance for Allen Matkins' retention.  As such,

16  the record reveals that Endurance consented to retention of Cozen O'Connor and Walter Wilhelm only.

17  As such, Endurance obligated itself only to Cozen O'Connor and Walter Wilhelm.[9]

18      Turning to rates, the record is clear that Endurance committed itself to $350/hour for partners,

19  $250/hour for associates, and $150/hour for paralegals.  The record is also clear that the insureds desired

20  to use Cozen O'Connor but were no less than hesitant to approach Cozen O'Connor to accept

21  Endurance's rates.  Ms. Franson's January 14, 2010 email stated: "Mr. Kashian seems hesitant to

22  approach Cozen O'Connor regarding their rates, but he definitely wants to use them."  The insureds

23  point to no writing whereby Endurance committed to rates other than the ROR letter rates.  As such, the

24  record is clear that Endurance committed itself to pay no more than the ROR letter rates.  The issue

25  whether it was required to pay rates submitted in invoices will be addressed below.

26  _____

27      [8]      This issue of retention is separate from rates which will be addressed below.

28      [9]      Moreover, the insureds fail to substantiate the need for Allen Matkins as a third defense firm despite its
    expertise in partnership law.

### Waiver And Estoppel

Endurance argues that the insureds' conduct waived and/or estopped them to seek defense costs to which Endurance did not consent.

The equitable estoppel elements are: "(1) The party to be estoped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the other party to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage he has thus inflicted upon the second party." *City of Hollister v. Monterey Ins. Co.,* 165 Cal.App.4th 455, 488, 81 Cal.Rptr.3d 72 (2008). "Equitable estoppel is based upon the fundamental principle that 'one's conduct has induced another to take such a position that he will be injured if the first party is permitted to repudiate his acts.'" *Elliano v. Assurance Co. of America*, 3 Cal.App.3d 446, 450-451, 83 Cal.Rptr. 509 (1970) (quoting *Bastanchury v. Times Mirror Co.*, 68 Cal.App.2d 217, 240, 156 P.2d 488 (1945)). The doctrine of equitable estoppel "provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *Strong v. County of Santa Cruz*, 15 Cal.3d 720, 725, 125 Cal.Rptr. 896 (1975). "Although equitable estoppel is generally a question of fact, it is a question of law when the facts are undisputed and only one reasonable conclusion can be drawn from them." *Mt. Holyoke Homes, LP v. California Coastal Com'n*, 167 Cal.App.4th 830, 840, 84 Cal.Rptr.3d 452 (2008).

"Waiver is a voluntary relinquishment, expressly or impliedly, of a known right and depends upon the intention of one party only." *Elliano*, 3 Cal.App.3d at 450, 83 Cal.Rptr. 509 (1970). Waiver exists "when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Intel Corp. v. Hartford Acc. & Idem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991). "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 31, 44 Cal.Rptr.2d 370 (1995).

Endurance argues that the insureds waived rights to seek defense arrangements beyond that indicated in the ROR letter because the insureds induced Endurance to believe that the ROR letter's defense arrangement was acceptable and to accept Cozen O'Connor and Walter Wilhelm as defense

1   counsel.  Endurance notes that it detrimentally relied on the insureds given their failure to raise

2   "objections or concerns" with the ROR letter's conditions.

3       The insureds argue that Endurance experienced no detrimental reliance since it was obligated

4   to provide independent defense counsel to the insureds after invoking conduct-based coverage defenses.

5   The insureds point to the absence of their blameworthy or inequitable conduct in that the evidence shows

6   that the insureds insisted that Endurance perform its obligations to provide independent counsel.  The

7   insureds argue that "there is nothing 'blameworthy or inequitable' about declining to immediately

8   consider Endurance's purported 'offer' to curtail its own contractually imposed defense obligations

9   while the Insureds were endeavoring to defend against Gottschalks." Turning to waiver, the insureds

10  note the absence of their written waiver to independent counsel.

11      The record demonstrates that Endurance fails to establish equitable estoppel elements.  The

12  insureds' conduct, although dilatory and unforthcoming, did not cause Endurance to suffer a necessary

13  disadvantage for equitable estoppel to apply.  As explained above, Endurance committed itself only to

14  retention of Cozen O'Connor and Walter Wilhelm at ROR letter rates.  Endurance has not been

15  compelled to pay all defense costs.  In fact, Endurance has prevented exploitation at the insureds' hands

16  by paying limited amounts and filing this action.

17      In addition, Endurance has failed to demonstrate necessary elements of the insureds' waiver.

18  There is no evidence that the insureds expressly waived policy rights.  Factual issues arise whether the

19  insureds impliedly waived policy rights.  The record reveals that the insureds delayed in responding to

20  the ROR letter and Mr. Little's follow up inquiries.  Such delay, although demonstrating brinkmanship,

21  does not equate to intentional relinquishment of policy rights, especially considering that the insureds

22  sought payment for all defense costs.  In the end, Endurance fails to demonstrate that it is entitled to

23  summary judgment that the insureds are estopped to pursue or waived rights to pursue defense costs.

### Conflict Of Interest

#### *Independent Counsel*

26      The insureds argue that the ROR's letter's raising conduct-based coverage defenses created a

27  conflict of interest between the insureds and Endurance to entitle the insureds to immediate independent

28  counsel.

The California Court of Appeal has explained the inception of a conflict of interest between insurer and insured arising from a claim of the insured's intentional conduct:

> Perhaps the most common situation in which a conflict of interest exists and independent or *Cumis* counsel[10] is required occurs when the insured's allegedly wrongful conduct could be found to be intentional, with coverage thus depending on the ultimate characterization of the insured's actions. Both the insured and the insurer, of course, share a common interest in defeating the claims. But if liability is found, their interests diverge in establishing the basis for that liability.

*Long v. Century Indem. Co.*, 163 Cal.App.4th 1460, 1471, 78 Cal.Rptr.3d 483 (2008); *see Foremost Ins. Co. v. Wilks*, 206 Cal.App.3d 251, 261, 253 Cal.Rptr. 596 (1988) ("If the reservation of rights arises because of coverage questions which depend on the insured's own conduct, a conflict exists."); *Purdy v. Pacific Automobile Ins. Co.*, 157 Cal.App.3d 59, 76, 203 Cal.Rptr. 524 (1984) ("when a conflict develops, the insurer cannot compel the insured to surrender control of the litigation, and must, if necessary, secure independent counsel for the insured").

Section 2860(b) provides that "when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled **by counsel first retained by the insurer** for the defense of the claim, a conflict of interest may exist." (Bold added.) "Civil Code section 2860, subdivision (b), tells us when a conflict may exist, i.e., when there is a reservation of rights and **first counsel chosen by the insurer can control the outcome of the coverage issue**." *United States Fidelity & Guaranty Co. v. Superior Court*, 204 Cal.App.3d 1513, 1525, 252 Cal.Rptr. 320 (1988) (bold added).

"California law provides that in a conflict of interest situation, the insurer's desire to control exclusively the defense must yield to its obligation to defend the policyholder. Accordingly, the insurer's obligation to defend extends to paying the reasonable value of the legal services and costs performed by independent counsel selected by the insured." *Previews, Inc. v. California Union Ins. Co.*, 640 F.2d 1026, 1028 (9th Cir. 1981). However, to require independent counsel, the "conflict must be significant, not merely theoretical, actual, not merely potential." *Dynamic Concepts, Inc. v. Truck Ins. Exchange*,

---

[10] The term "Cumis counsel" derives from the holding of *San Diego Navy Federal Credit Union v. Cumis Ins.*, 162 Cal.App.3d 358, 208 Cal.Rptr. 494 (1984), which recognized the insurer's duty to appoint independent counsel for its insured under certain circumstances. The Legislature codified that duty in 1987 by enacting section 2860. (Stats.1987, ch. 1498, § 4, p. 5779; *Long v. Century Indemnity*, 163 Cal.App.4th 1460, 1470, n. 6, 78 Cal.Rptr.3d 483 (2008).

27

61 Cal.App.4th 999, 1007, 71 Cal.Rptr.2d 882 (1998).

"The Legislature declined to adopt the absolutist view that insurer-appointed defense counsel will only offer token resistance to claims that fall outside a policy's coverage terms or limits or will steer the defense in a direction favorable to the insurer." *Dynamic Concepts*, 61 Cal.App.4th at 1007, n. 5, 71 Cal.Rptr.2d 882. "The mere fact that the insurer disputes coverage and is defending on a 'reservation of rights' basis does not preclude insurer-appointed counsel from providing a quality defense." *Emplrs Ins. of Wausau v. Cal. Water Serv. Co.*, 2008 U.S. Dist. LEXIS 65433, at *20 (N.D. Cal. 2008) (citing *Dynamic Concepts*, 61 Cal. App. 4th at 1007, 71 Cal. Rptr. 2d 882; *Golden Eagle Ins. Co. v. Foremost Ins Co.*, 20 Cal. App. 4th 1372, 1394, 25 Cal. Rptr. 2d 242 (1993)). "In the absence of dispute over some underlying fact, the existence of a conflict is a question of law for the trial judge to decide, not a jury question." *Blanchard v. State Farm Fire & Casualty Co.*, 2 Cal.App.4th 345, 2 Cal.Rptr.2d 884 (1991).

The insureds argue that since the Gottschalks complaint alleged the insureds' intentional and negligent interference with prospective economic advantage, "an immediate conflict of interest was created when Endurance raised the intentional act exclusion and Insurance Code § 533 [insured's willful act][11] as coverage defenses." The insureds contend that the ROR letter created an immediate conflict of interest in that "defense counsel would have been put into a position of having to develop a litigation strategy which would either favor the Defendants' interests by minimizing exposure for non-covered harmful conduct towards Gottschalks or favor Endurance's interests by minimizing exposure for covered harmful conduct towards Gottschalks."

Endurance responds that no conflict of interest arose under section 2860(b) in the absence of the "tripartite relationship" (insurer retained defense counsel owing duties to insured and insurer) in that the insureds "first retained" their chosen, existing counsel in the Gottschalks bankruptcy and underlying action, and Endurance never selected different counsel. As such, Endurance notes that the insureds and

---

[11]     California Insurance Code section 533 ("section 533") provides an "insurer is not liable for a loss caused by the willful act of the insured . . ." Section 533 "reflects a fundamental public policy to deny insurance coverage for wilful wrongs" and "is an implied exclusionary clause which, by statute, must be read into all insurance policies." *Downey Venture v. LMI Ins. Co.*, 66 Cal.App.4th 478, 499-500, 78 Cal.Rptr.2d 142 (1998).

their attorneys "could never be in a conflicted position vis a vis Endurance since their chosen lawyers had no attorney-client relationship with Endurance" and could not control the outcome of coverage issues on which Endurance reserved rights.  Endurance continues that an "actual conflict of interest does not automatically arise simply because an insurer reserves rights on a coverage issue" in that an actual conflict arises when "defense counsel has acted contrary to the interests of the insured."

This Court agrees with Endurance's analysis that the insureds "cannot show that they did not have their own counsel or that they were entitled to independent counsel under § 2860."  A section 2860(b) conflict did not arise in that the insureds' chosen counsel did not control the outcome of the coverage issue.  This Court's evaluation in its prior order on the insureds' motion to dismiss applies equally here:

> The insureds' attempt to transmute the ROR letter into an actual conflict of interest is unavailing, especially given that their chosen counsel represents them in the underlying action and the insureds do not claim that their chosen counsel act contrary to the insureds' interests.  At its essence, the insureds' gripe is not about their counsel; it is about payment of defense counsel's entire fees at rates above those generally accepted by Endurance.  Moreover, the insureds fail to explain how their defense counsel are able to control the underlying action's outcome to create an actual conflict of interest, despite the ROR letter's reference to the intentional acts exclusion or Endurance's failure to obtain a written waiver.

Given the absence of a section 2860(b) conflict of interest under the circumstances, the insureds are denied summary judgment that "Endurance was not entitled to appoint or select its own chosen counsel" and that the insureds "at all times had the right to select and be represented by independent counsel." Effectively, the insureds were represented by independent counsel for conflict of interest purposes.

### Waiver Of Right To Independent Counsel

The insureds note that insurers are obligated "to advise their insureds of their right to independent counsel whenever their coverage position creates an actual conflict of interest triggering the right to independent counsel."  The insureds point to section 2860(a) which provides that if "a conflict of interest arises which creates a duty on the part of the insurer to provide independent counsel to the insured, the insurer shall provide independent counsel to represent the insured unless, at the time the **insured is informed** that a possible conflict may arise or does exist, the **insured expressly waives**, in writing the right to independent counsel."  (Bold added.)

The insureds fault Endurance's failure to advise them of their right to independent counsel or that

Endurance had made a determination as to the insureds' right to independent counsel.  The insureds further fault Endurance's position that it would select defense counsel unless the insureds accepted Endurance's defense arrangements.  The insureds accuse Endurance of attempting to "control the defense and limit its liability exposure."

The insureds further contend that they did not waive their right to independent counsel pursuant to section 2860(e), which provides:

> The insured may waive its right to select independent counsel by signing the following statement:   "I have been advised and informed of my right to select independent counsel to represent me in this lawsuit.  I have considered this matter fully and freely waive my right to select independent counsel at this time.  I authorize my insurer to select a defense attorney to represent me in this lawsuit."

The insureds point to an absence of evidence of their knowing waiver of their right to independent counsel.

Endurance responds that the need to advise of independent counsel did not arise given that the insureds used their own chosen counsel and "no harm resulted from any lack of notice to the extent it was required."  Endurance further faults the insureds' notion that Endurance attempted to control the insureds' defense in the underlying action given the absence of evidence that the insureds' defense counsel "acted any differently in their defense."  Endurance points to the insureds' concessions that Endurance did not direct the insureds or defense counsel on how to litigate, depose witnesses or defend the underlying action or what motions to file or not file.

Again, Endurance is correct.  In the absence of an actual conflict of interest, Endurance was not required to advise of independent counsel and secure a waiver.  The insureds were defended effectively by independent counsel to render a section 2860(e) waiver superfluous.

### **Allocation Of Defense Costs**

### ***Total Defense***

The insureds contend that Endurance was not entitled to allocate unilaterally defense costs between the insureds, on one hand, and RPP III, on the other hand.  The insureds argue that an insurer's attempt to limit payment of defense costs to covered claims on a "forward-going basis" breaches its defense duty as a "functional equivalent of a total denial."

The insureds point to *Buss v. Superior Court*, 16 Cal.4th 35, 49, 65 Cal.Rptr.2d 366 (1997),

30

where the California Supreme Court explained:

> To defend meaningfully, the insurer must defend immediately. . . . To defend immediately, it must defend entirely. It cannot parse the claims, dividing those that are at least potentially covered from those that are not. To do so would be time consuming. It might also be futile: The "plasticity of modern pleading" . . . allows the transformation of claims that are at least potentially covered into claims that are not, and vice versa. The fact remains: As to the claims that are at least potentially covered, the insurer gives, and the insured gets, just what they bargained for, namely, the mounting and funding of a defense. But as to the claims that are not, the insurer may give, and the insured may get, more than they agreed, depending on whether defense of these claims necessitates any additional costs.

The insureds contend that an insurer may not allocate defense costs between an insured and non-insured "unless those defense costs are solely attributable to the defense of the non-insured party."  The Ninth Circuit Court of Appeals has explained:

> In evaluating whether defense costs should be allocated between the corporation and the insured directors and officers, courts have adopted the "reasonably related" test. . . . Defense costs are thus covered by a D & O policy if they are reasonably related to the defense of the insured directors and officers, even though they may also have been useful in defense of the uninsured corporation.

*Safeway Stores, Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 64 F.3d 1282, 1289 (9th Cir. 1995) (citations and internal quotations omitted).

The insureds argue that Endurance must pay all defense costs "reasonably related" to the insureds' defense and "may not allocate defense costs between an insured and non-insured party benefitted by a joint defense except for defense costs solely attributable to the defense of the non-insured."  The insureds contend that generally the defense costs cannot be allocated to RPP III because Endurance's invocation of conduct-based coverage defenses relinquished Endurance's right to select counsel and entitled the insureds "to enter into a joint defense arrangement with RPP III, the cost of which was the responsibility of Endurance."  The insureds argue that the policy's allocation provision does not relieve Endurance of its burden to demonstrate defense costs solely attributable to RPP III and that there is no evidence of defense costs allocated solely to RPP III.  As a reminder, the allocation provision states:

> If a **Claim** made against any **Insured** includes both covered and uncovered matters or is made against both an **Insured** and others not insured under this Policy, the **Insured** and the **Company** agree that there must be an allocation between insured and uninsured **Loss**. The **Insureds** and the **Company** shall use their best efforts to agree upon a fair and proper allocation between insured and uninsured **Loss**.  However, *the*

1    *Company* shall not seek to allocate with respect to **Claim Expenses** and shall pay one
     hundred percent (100%) of **Claim Expenses** so long as a covered matter remains within
2    the **Claim**.  (Italics added.)

3    The insureds argue that the allocation provision's third sentence is an "exception" to the preceding two

4    sentences for "Claim Expenses" in that the third sentence qualifies the allocation provision by barring

5    Endurance's allocation of Claim Expenses and requiring Endurance to pay 100 percent of Claim

6    Expenses.  The insureds argue that the third sentence exception refers to Claims against insureds and

7    non-insureds and that its promise "not to seek to allocate" applies to Claims against insureds and non-

8    insureds.  The insureds continue that the term Claim Expenses is not limited to an insured's defense

9    costs in that it includes "reasonable fees charged by any lawyer selected by mutual agreement" and "all

10   other reasonable fees, costs and expenses resulting from the investigation and defense of a Claim," a

11   phrase which encompasses joint defense costs of an insured and non-insured.  The insureds conclude

12   that they are entitled to all costs "reasonably related" to their defense and that such costs cannot be

13   separated from defense costs devoted to RPP III to render as "arbitrary" a "percentage-based going

14   forward allocation."

15        The insureds further argue that "Endurance has made no effort to show what defense costs, if any,

16   are not 'reasonably related' to the costs of the Insureds' defense."  The insureds note that of all the

17   defense costs, only $14,344 is "allocable solely to the defense of RPP III."

18        Endurance responds that the policy does not require it defend an uninsured entity such as RPP

19   III.  "Although the duty to defend under California law is broad, it does not encompass the duty to defend

20   persons who are not insured under the policy."  *Nakauchi v. Allstate Ins. Co.*, 119 Fed.Appx. 116, 117,

21   2004 WL 2980664, *1 (9th Cir. 2004); *see Alex Robertson Co. v. Imperial Cas. & Indem. Co.*, 8

22   Cal.App.4th 338, 10 Cal.Rptr.2d 165, 168 (1992).  Endurance points to Ms. Franson's testimony to omit

23   RPP III from the policy:

24        The Witness: I can't really say exactly what Mr. Kashian was thinking, but he did not
          instruct me to add them.
25
          Q.    And thus they were not added, River Park Properties III, as a named insured
26              under [the policy]?

27        A.    Correct.
          Endurance challenges the insureds' reliance on the "reasonably related" test in that cases applying
28

1  it "did not contain an allocation provision concerning payment of defense costs between insured and

2  non-insured parties."  As such, Endurance argues that the policy's allocation provision, not the

3  "reasonably related" test governs "allocation of defense costs incurred by the Insureds and RPP III."

4       Endurance characterizes the RPP III as the "primary target" of the Gottschalks complaint in that

5  the Gottschalks complaint alleged six claims against RPP III alone, seven claims against the insureds

6  and RPP III jointly, and none against the insureds alone.  Endurance further notes that the Gottschalks

7  complaint focused on RPP III as the general partner with Gottschalks in Park 41.

8       Endurance concludes that the policy's allocation provision and Claim Expenses definition

9  "clearly provide that Endurance shall only be responsible for defense costs incurred by Insureds, even

10  where . . . the Insureds and non-insured parties are co-defendants in a Claim."

11       There is agreement that RPP III is not an insured under the policy.  This Court agrees with

12  Endurance that the "reasonably related" does not apply given the allocation provision which this Court

13  must apply under the circumstances.  The "Claim" at issue is the Gottschalks complaint which includes

14  claims against the insureds and RPP III jointly and RPP III alone to result in a "Claim" that "is made

15  both against an Insured and others not insured."  As such, the allocation provision provides that

16  Endurance and the insureds "agree that there must be an allocation between insured and uninsured

17  **Loss**."[12]  The allocation provision mandates an allocation under the circumstances here.

18       The allocation also obligates Endurance and the insureds to "use their best efforts to agree upon

19  a fair and proper allocation between insured and uninsured **Loss**."  The record reveals that Endurance

20  committed its best efforts to reach an allocation agreement, starting with the ROR letter and continuing

21  with Mr. Little's dogged efforts through numerous emails.  The same cannot be said for the insureds.

22  The inferences from the record are that the insureds devoted substantial efforts to attempt to settle the

23  underlying action and decided to address allocation and insurance matters later.  There is no evidence

24  that the insureds used "best efforts" to agree to an allocation.

25       Furthermore, this Court is not persuaded by the insureds' interpretation of the allocation

26

27       [12]       The policy defines Loss as: "1.  **Damages** in excess of the self-insured retention that the **Insured** is

28  obligated to pay; and 2.  **Claim Expenses** in excess of the self-insured retention, whether incurred by the **Company** or by
   the **Insured**."

provision's third sentence.  The third sentence does not obligate Endurance to pay RPP III's Claim Expenses.  It obligates Endurance to pay 100 percent of Claim Expenses attributable to the insureds. In other words, when an insured and non-insured are subject to the same Claim, Endurance must pay all Claim Expenses for defense of the insured.  Allocation of defense costs was in order and could have been accomplished if the insureds had counsel separate from RPP III.  The insureds, apparently for strategy and cost-savings reasons, chose not to and clung to a joint defense arrangement with RPP III which pre-existed the ROR letter and Endurance's allocation communications.  In short, Endurance was entitled to invoke the allocation provision.

With the ROR letter, Endurance advocated a one-third allocation to the insureds given that Gottschalks complaint attributed to RPP III "the majority, if not all, of any potential liability."  The insureds offer nothing meaningful to challenge Endurance's allocation, except their defense counsels' overbroad declarations that the insureds' and RPP III's defense costs "could not be separately identified." Nothing in the record reveals that Endurance's one-third allocation to the insureds was unreasonable or out of line with the insureds' potential liability.

### *Ambiguity*

The insureds argue that at a minimum, the policy's allocation provision is ambiguous in that a reasonable interpretation of the third sentence's promise not to allocate "applies to defense costs reasonably related to the insureds' defense and which may also incidently benefit a non-insured but are not capable of being solely allocated to such non-insured."  The insureds argue that the policy's "Claim Expenses" definition "does not exclude defense costs which benefit a non-insured codefendant."

As this Court evaluated directly above, the allocation provision is not ambiguous under the present circumstances.

### **Reasonableness Of Defense Costs**

### *Unconscionability*

The insureds characterize as unconscionable the policy provision that Endurance's determination "as to the reasonableness of **Claim Expenses** shall be conclusive on the **Insured**."

"[U]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the

1  other party." *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.,* 200 Cal.App.3d 1518, 1534, 246

2  Cal.Rptr. 823 (1988).

3      Unconscionability has substantive and procedural elements. *See American Software, Inc. v. Ali*,

4  46 Cal.App.4th 1386, 1391, 54 Cal.Rptr.2d 477 (1996).  "In California, a contract or clause is

5  unenforceable if it is both procedurally and substantively unconscionable." *Ting v. AT&T*, 319 F.3d

6  1126, 1148 (9th Cir. 2003), *cert. denied*, 540 U.S. 811, 124 S.Ct. 53 (2003).

7      "Substantive unconscionability focuses on the actual terms of the agreement, while procedural

8  unconscionability focuses on the manner in which the contract was negotiated and the circumstances of

9  the parties." *American Software*, 46 Cal.App.4th at 1391, 54 Cal.Rptr.2d 477.  The general requirement

10  is "a showing of both substantive and procedural unconscionability at the time the contract is made."

11  *American Software*, 46 Cal.App.4th at 1391, 54 Cal.Rptr.2d 477.

12      Indication of procedural unconscionability includes "oppression, arising from inequality of

13  bargaining power and the absence of real negotiation or a meaningful choice" and "surprise, resulting

14  from hiding the disputed term in a prolix document." *Vance v. Villa Park Mobilehome Estates*, 36 Cal.

15  App.4th 698, 709, 42 Cal.Rptr.2d 723 (1995).  "A contract is procedurally unconscionable if it is a

16  contract of adhesion, i.e., a standardized contract, drafted by the party of superior bargaining strength,

17  that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ting*,

18  319 F.3d at 1149.

19      Substantive unconscionability arises from contract terms so one-sided as to *"shock the*

20  *conscience." California Grocers Assn. v. Bank of America*, 22 Cal.App.4th 205, 214, 27 Cal.Rptr.2d

21  396 (1994) (italics in original).  Substantive unconscionability "refers to an overly harsh allocation of

22  risks or costs which is not justified by the circumstances under which the contract was made." *Ellis v.*

23  *McKinnon Broadcasting Co.*, 18 Cal.App.4th 1796, 1803, 23 Cal.Rptr.2d 80 (1993).

24      The California Court of Appeal has explained further:

25      With a concept as nebulous as "unconscionability" it is important that courts not be thrust
      in the paternalistic role of intervening to change contractual terms that the parties have
26      agreed to merely because the court believes the terms are unreasonable. The terms must
      shock the conscience.

27
          The critical juncture for determining whether a contract is unconscionable is the
28      moment when it is entered into by both parties – not whether it is unconscionable in light

35

1    of subsequent events. (Civ. Code, § 1670.5.) Unconscionability is ultimately a question
2    of law for the court.

3    *American Software*, 46 Cal.App.4th at 1392, 54 Cal.Rptr.2d 477.

4          The insureds characterize the policy as an adhesion contract "offered to potential policyholders
5    on a 'take it or leave it' basis."  The insureds argue that the determination of reasonableness provision
6    is substantively unconscionable in allowing Endurance to made unilateral determinations as to
7    reasonableness of defense costs without reference to justification for or circumstances surrounding
8    defense costs or industry standards and without recourse to dispute Endurance's determination.  The
9    insureds further fault Endurance's failure to offer binding arbitration to resolve the defense costs dispute
10   pursuant to section 2860(c).

11         Endurance responds that the "reasonable" determination clause is "plain and unambiguous," not
12   unconscionable.  "[W]e do not rewrite any provision of any contract, [including an insurance policy],
13   for any purpose."  *Certain Underwriters at Lloyd's of London v. Superior Court,* 24 Cal.4th 945, 968
14   103 Cal.Rptr.2d 672 (2001).  Endurance characterizes the insureds as "sophisticated" with a "dedicated
15   risk manager" and broker and notes the insureds' ability to negotiate policy endorsements.  Endurance
16   continues that the insureds' reliance on section 2860(c) arbitration is misplaced in that section 2860(c)
17   provides that it "does not invalidate other different or additional policy provisions pertaining to
18   attorney's fees or providing methods of settlement of disputes concerning those fees."

19         Under the present circumstances, the "reasonable" determination clause is not unconscionable.
20   There is no conscience shocking that an insurer would seek to control defense costs and limit them to
21   a reasonable range.  Moreover, the insureds are sophisticated in business and demonstrated adeptness
22   in addressing their insurance needs, including utilizing a full-time risk manager and broker and selecting
23   policy endorsements.  The insureds bargained for various policies year-to-year, including the Fireman's
24   Fund policy.  The insureds fail to raise factual issues as to unconscionability and to demonstrate
25   applicability of section 2860(c).

26                          ***Unilateral Determination – Objective Reasonableness***

27         The insureds accuse Endurance of "unilateral application" of the policy's provision of
28   Endurance's determination "as to reasonableness" of defense costs.  The insureds argue that Endurance

lacks evidence of objective reasonableness of its $70,101.34 payment toward $1,457,295.95 defense costs in excess of the insureds' $100,000 self-insured retention. The insureds argue that the defense costs were "commercially reasonable" given the complexity of legal issues involving several areas of law, the need for California and Delaware counsel, and O'Melveny & Myers, one of the country's largest law firms, serving as opposing counsel.

As a reminder, the policy defines Claim Expenses as "reasonable fees charged by any lawyer selected by mutual agreement" between Endurance and the insureds. The record reflects that Endurance and the insureds reached a mutual agreement as to selection of Walter Wilhelm and Cozen O'Connor in that Endurance expressly agreed to their selection and the insureds used the two firms. There was no mutual agreement as to Allen Matkins or third-party vendors to alleviate Endurance's responsibility for their fees.

The policy further provides that Endurance's determination "as to the reasonableness" of defense costs "shall be conclusive" on the insureds. Endurance agreed to rates of $350/hour for partners, $250/hour for associates and $150/hour for paralegals. The record reflects that Walter Wilhelm accepted such rates to reflect their reasonableness as to that firm. As to Cozen O'Connor, the record reflects that it commanded more than the Endurance rates. However, the insureds fail to demonstrate that Endurance was precluded legally to set the rates it would pay or that they were objectively unreasonable, especially considering that Walter Wilhelm accepted the Endurance rates.

Moreover, section 2860(c) provides

> The insurer's obligation to pay fees to independent counsel selected by the insured is limited to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended.

The insureds offer no evidence that Cozen O'Connor charged ordinary course of business insurance defense rates. The inferences from the record are that Cozen O'Connor did not treat the underlying action as an insurance matter with applicable billing rates and charged rates in keeping with its stature as a large international law firm.

The record further reflects that the insureds had several options:

1.      Accept Endurance's selection of counsel who accepted Endurance's rates so that the

1    insureds would not need to pay out of pocket above the $100,000 self-insured retention;

2    2.    Negotiate with Cozen O'Connor to accept the Endurance rates; or

3    3.    Pay Cozen O'Connor the difference between the Endurance rates and Cozen O'Connor's

4          billed rates.

5  The insureds chose the third option.    Such choice does not translate to Endurance's objective

6  unreasonableness.

7                                      **Subrogation**

8          The insureds contend that Endurance is precluded to pursue subrogation claims against RPP III

9  and Park 41.  Endurance counters that it "is subrogated to the Insureds' rights to indemnification from

10  RPP III to the extent Endurance is obligated to make any payments to the Insureds as reimbursement for

11  their defense costs."

12          "In the insurance context, subrogation takes the form of an insurer's right to be put in the position

13  of the insured for a loss that the insurer has both insured and paid." *State Farm General Ins. Co. v. Wells*

14  *Fargo Bank, N.A.,* 143 Cal.App.4th 1098, 1106, 49 Cal.Rptr.3d 785 (2006).  "When an insurance

15  company pays out a claim on a property insurance policy, the insurance company is subrogated to the

16  rights of its insured against any wrongdoer who is liable to the insured for the insured's damages." *State*

17  *Farm,* 143 Cal.App.4th at 1106, 49 Cal.Rptr.3d 785.  "An insurer does not have an independent or

18  automatic right of subrogation in all situations" and has the "burden to establish that it can stand in the

19  shoes of its insured." *Rokeby-Johnson v. Aquatronics International, Inc.*, 159 Cal.App.3d 1076, 1085,

20  206 Cal.Rptr. 232 (1984).

21          "While the insurer by subrogation steps into the shoes of the insured, that substitute position is

22  qualified by a number of equitable principles. For example, an insurer cannot bring a subrogation action

23  against its own insured." *State Farm,* 143 Cal.App.4th at 1106, 49 Cal.Rptr.3d 785; *see St. Paul Fire*

24  *& Marine Ins. Co. v. Murray Plumbing & Heating,* 65 Cal.App.3d 66, 76, 135 Cal.Rptr. 120 (1976)

25  ("No right of subrogation can arise in favor of an insurer against its own insured since, by definition,

26  subrogation exists only with respect to rights of the insurer against third persons to whom the insurer

27  owes no duty."); *Truck Ins. Exchange v. County of Los Angeles,* 95 Cal.App.4th 13, 21, 115 Cal.Rptr.2d

28  179 (2002) (an insurer that has issued a liability policy to the tortfeasor responsible for causing the

                                         38

insured's loss cannot enforce subrogation rights).

The insureds argue that an insurer is unable to seek subrogation from third-parties if doing so shifts the loss back to the insured. *See Longoria v. Hengehold Motor Co.*, 142 Cal.App.3d 1059, 1061-1062, 191 Cal.Rptr. 439 (1983) (insurer's subrogation action against vehicle owner barred where vehicle owner would be in position to recover from insured which "[i]n effect, the insured would be covering his own loss, despite the insurer's having accepted premiums to do so. This inequitable result contravenes public policy.")

The insureds argue that their "substantive financial interests" in RPP III and Park 41 prevent Endurance's subrogation claims against RPP III and Park 41 which would allow Endurance to recover from the insureds "for the same loss in contravention of equitable principles and public policy." The insureds note that "an insurer has a right of subrogation against a contractual indemnitor who indemnified the same loss only if the indemnitor caused the loss paid by the insurer." *Truck Ins. Exchange*, 95 Cal.App.4th at 25, 115 Cal.Rptr.2d 179. The insureds conclude that Endurance cannot seek subrogation from RPP III and/or Park 41"as they were codefendants and entities controlled by the insureds, not separate parties which independently caused Gottschalks' purported losses." The insureds further challenge the absence of evidence that RPP III caused Gottschalks' alleged damages.

Endurance responds that RPP III should indemnify the insureds' defense costs under the RPP III limited partnership agreement, which provides that RPP III is obligated to indemnify Lance-Kashian for "liability or damage incurred by reasons of any act performed or omitted, to be performed by [Lance-Kashian] in connection with the Business of the Partnership, including attorney fees incurred by [Lance-Kashian] in connection with the defense of any action based on any such act or omission, which attorney fees may be paid as incurred, including all such liabilities as permitted by law." Endurance concludes that "subrogation is not precluded from a contractual indemnitor such as RPP III because RPP III participated in causing the loss."

Endurance notes that the underlying action pursued claims against Lance-Kashian as to its conduct related to RPP III but Lance-Kashian has not sought indemnity from RPP III. Endurance points to the policy's subrogation provision:

In the event of any payment under this Policy, the **Company** shall be subrogated

39

to all the **Insured's** rights of recovery therefore against any person or organization. The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights and the **Insured** shall do nothing to prejudice such rights.

Endurance concludes that it "is subrogated to the insureds' rights to indemnification from RPP III to the extent Endurance is obligated to make any payments to the insureds."[13]   Endurance characterizes the insureds' interest in RPP III as "a minority ownership" given that Lance-Kashian owns 1.29 percent of RPP III.

Endurance fails to meet its burden that it is entitled to subrogation from RPP III and Park 41. Endurance merely points to an indemnity provision in a limited partnership agreement and fails to demonstrate how it entitles Endurance to subrogation. The insureds have an interest in RPP III to raise no less than an issue that Endurance attempts to shift the loss back to the insureds.

Moreover, an Endurance subrogation claim would contradict its position on allocation in which Endurance no less than insinuated that RPP III was the primary target of the Gottschalks complaint and that RPP III's alleged wrongs and potential liability were independent of the insureds to warrant allocation of defense costs. In other words, as to allocation, Endurance took the position the insureds, on one hand, and RPP III, on the other hand, had distinct potential liability to Gottschalks to negate grounds for subrogation. This Court agrees with the insureds that Endurance lacks necessary evidence to invoke subrogation. As such, the insureds are entitled to summary judgment that Endurance is precluded to pursue subrogation claims against RPP III and Park 41.

### **Other Insurance**

The policy includes an "Other Insurance" provision which provides:

All amounts payable under this Policy shall be specifically excess of, and shall not contribute with, any other valid and collectible insurance available to the Insured whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is specifically excess of this Policy. This Policy shall not be subject to the terms of any other insurance policy.

Endurance argues that the other insurance provision renders its policy excess to the $1 million available to the insureds under the Fireman's Fund policy.

The insureds characterize Endurance as the "primary insurer" with a "duty to defend . . . until

---

[13]   Endurance further faults the insureds' failure to secure Lance-Kashian's indemnity rights to comply with the policy's cooperation provision.

40

the conclusion of the underlying lawsuit or until the insurer can establish conclusively that there is no potential for coverage and therefore no duty to defend." *Amato v. Mercury Casualty Co.*, 53 Cal.App.4th 825, 832, 61 Cal.Rptr.2d 909 (1997).  The insureds fault Endurance's reliance on the Fireman Fund policy in that the "fact that one insurer may owe a duty to provide a defense will not excuse a second insurer's failure to honor its separate and independent contractual obligation to defend." *Emerald Bay Community Ass'n v. Golden Eagle Ins. Corp.*, 130 Cal.App.4th 1078, 1089, 31 Cal.Rptr.3d 43 (2005).

The insureds further note that "other insurance" clauses apply only when concurrent insurers cover the same risk and that Endurance fails to demonstrate the Endurance and Fireman's Fund policies "covered the same risks."  The insureds conclude that Endurance "other insurance" remedy is to pay the insureds' defense costs and seek reimbursement from Fireman's Fund.

Endurance fails to explain application of the other insurance provision policy other than to mention the Fireman's Fund policy and the insureds' attempt to invoke coverage under it.  The insureds raise valid points, especially as to the different risks covered by the Endurance and Fireman's Fund policies.  Without more from Endurance, this Court surmises that Endurance does not meaningfully contend that its policy is excess.  Moreover, the Endurance complaint fails to raise the excess issue.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court GRANTS summary judgment to the effect that:

1.      The insureds effectively utilized independent counsel;

2.      Endurance properly allocated defense costs and set reasonable rates;

3.      Endurance is obligated to pay only one-third of the attorney fees charged by Cozen O'Connor and Walter Wilhelm to defend the underlying action at maximum hourly rates of $350 for partners, $250 for associates, and $150 for paralegals;

4.      Endurance is not obligated to pay other defense costs in the absence of its consent; and

5.      Endurance is precluded to seek subrogation against RPP III and Park 41.

This Court concludes that such summary judgment is conclusive effectively on all the parties' respective claims and grounds for summary judgment.  If the parties disagree, each side, no later than November 15, 2011, may file up to a 10-page statement to identify remaining claims and to explain why they remain for disposition.  Based on such statements, this Court will determine whether to enter

1   judgment or maintain this action for disposition of remaining claims.

2        IT IS SO ORDERED.

3   **Dated:   November 8, 2011**          /s/ Lawrence J. O'Neill
                                      UNITED STATES DISTRICT JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28